FILED

2010 Mar-31  PM 04:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JEREMIE WHITSEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 2:08-cv-1632-SLB** |
| | ) | |
| **NORFOLK SOUTHERN RAILWAY** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment.  (Doc. 17.)[1]  In his complaint, plaintiff Jeremie Whitsey ("Whitsey") alleges that his former employer, defendant Norfolk Southern Railway Company ("NSR"), terminated him on the basis of race.  42 U.S.C. § 1981 ("section 1981").[2]  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 17), is due to be denied.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

[2]Count's II and III of Plaintiff's Amended Complaint, alleging Title VII claims for race and sex discrimination, were dismissed by Plaintiff.  (Doc. 16.)

# I.  <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor.  *See id.* at 255.  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Graham v.*

*State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)).

## II.  STATEMENT OF FACTS

Whitsey is an African-American male.  (Doc. 19, Ex. 7.)  At the time of his termination, Whitsey worked for NSR as a certified locomotive Engineer.  (Doc. 19, Ex. 19 at ¶ 5, Campbell Decl.)  NSR operates a freight railroad that runs through 22 eastern states, the District of Columbia, and Ontario, Canada, and employs approximately 29,000 persons in various departments, including the Transportation Department, which operates the trains.  (*Id.* at ¶¶ 2-3.)  Whitsey worked in NSR's Transportation Department at or out of Norris Yard near Birmingham, Alabama, the main terminal of operation in the NSR's Alabama Division.  (*Id.* at ¶¶ 2, 4.)  Whitsey was hired in 1998 as a Conductor trainee and became a certified locomotive Engineer in February of 2006. (*Id.* at ¶ 5.)

### Operation of Trains

The Transportation Department's responsibilities include the safe operation of multiple trains on 21,000 miles of track.  (Doc. 19, Ex. 19 at ¶ 6.)  In addition to freight trains, Amtrak passenger trains also operate over certain NSR tracks in the Alabama Division. (*Id.*)  A typical train crew consists of an engineer and a conductor, both of whom are responsible for the safe operation of the train.  (*Id.* at ¶ 7.)  Engineer and conductor trainees are also sometimes present on trains.  (*Id.*)  The conductor handles switches, applies the brakes, protects shove movements, and is responsible for seeing that

the crew adheres to all rules.  (Doc. 19, Ex. 13, p. 27, Campbell Depo.)  An engineer is

the employee that actually operates the controls of the locomotive engine.  (*Id.*, pp. 27-

28.)  Despite the joint responsibility, if a difference of opinion on how to proceed arises,

the conductor has the final say.  (*Id.*, p. 28.)

The movement of trains is governed by signals that are located at regular intervals

either over, or alongside, the tracks where they are visible to the train crew. (Doc. 19, Ex.

19 at ¶ 8.)  Locomotive engineers and conductors are schooled, tested, and trained on the

job to recognize, and react to the various signals relating to operations of a train. (*Id.* at ¶

9.)  Compliance with the signal rules is critical to the safe operation of trains. (*Id.*)

Among the signals that control train movement is the "Approach" signal, which indicates:

"Proceed preparing to stop at next signal. Train or engine exceeding Medium Speed must

at once reduce to that speed." (*Id.* at ¶ 10.)  The most restrictive signal is the "Stop"

signal, which indicates "A train or engine approaching a signal displaying a STOP

indication must stop before any part of the equipment passes the signal." (Doc. 19, Ex. 19

at ¶ 11; *id.*, Ex. 1, p. 88, Whitsey Depo.)  A Stop signal is an absolute instruction to an

approaching train that it cannot pass the signal without authorization from the dispatch

center.  Permitting a train to go past a Stop signal is universally known on the railroad as

"a Red Board violation," which is considered a major rule infraction. (Doc. 19, Ex. 19 at

¶11.)

4

**Whitsey's Red Board Violation**

Whitsey committed a Stop signal violation on April 29, 2006, while assigned as the engineer on a train out of Birmingham.  (Doc. 19, Ex. 19 at ¶ 13.)  The conductor on the train with Whitsey at the time was Nashanta Williams, an African-American female. (*Id.*)  Whitsey and Williams were assigned to Train 22E traveling east from Birmingham, Alabama toward Atlanta, Georgia. (Doc. 19, Ex. 19 at ¶15; *id.*, Ex. 21, p. 3, Hearing Transcript.)  When Train 22E reached an intermediate point called Diamond Head, at mile post 789.4, there was an "Approach" signal, indicating that they should reduce the train's speed and be prepared to stop at the next signal. (Doc. 19, Ex. 19 at ¶16.)  While the train was traveling between Diamond Head and the next signal at Lovick, at mile post 787.7, a distance of 1.7 miles, Williams warned Whitsey at least twice that he was operating under an Approach signal; despite her warning, when the train approached the Stop signal at Lovick, it was going too fast to stop.  (Doc. 19, Ex. 19 at  ¶16; *id.*, Ex. 1, pp. 109-110.)  When Whitsey saw the red Stop signal, he engaged the emergency brake system on the train; nevertheless, the train went past the Stop signal by 1,075 feet.  (Doc. 19, Ex. 19 at ¶17.)

**NSR Disciplinary Procedures**

The procedure for handling Red Board violations at the time of Whitsey's incident involved an initial investigation in the field.  (Doc. 19, Ex. 13, pp. 19-20.)  If facts gathered in the field investigation indicated a charge for a rule violation, then NSR

conducted an investigative hearing that complied with the provisions of the collective bargaining agreement between NSR and the employee's union, at which time a record of the facts and circumstances of the incident is made.  (Doc. 19, Ex. 19 at ¶ 12.)  At the investigative hearing, the employee charged with the violation is represented by union officials who are able to cross-examine witnesses, enter objections, and offer witnesses and other evidence on behalf of the charged employee. (*Id.*; Doc. 19, Ex. 1, pp. 93-94.) At the conclusion of the hearing, the hearing officer decides upon the discipline, if any, to be imposed for the violation.  (Doc. 19, Ex. 19 at ¶ 12.)  That decision can be appealed to higher NFS management to overturn or modify the discipline.  (*Id.*)  Thereafter, pursuant to the provisions of the Railway Labor Act, 45 U.S.C. § 153 First (i), a disputed decision may be taken before a Public Law Board ("PLB") consisting of the carrier's representative, a union representative, and a neutral arbitrator.  The action of the PLB is "final and binding upon both parties to the dispute."  45 U.S.C. §153 First (m).  The PLB can sustain, modify or reverse the carrier's decision. (*Id.*)

According to NSR's brief, at the time of Whitsey's incident, April of 2006, and for some time prior, it was a general practice in the Alabama Division to issue a 30-day suspension for a Stop signal violation when (a) the employee had accepted the discipline and had waived a formal investigation, and (b) the employee's discipline record was "relatively clean."  (Doc. 18, p. 11 at ¶ 30.)  The policy was not part of the collective bargaining agreement or otherwise reduced to writing.  (Doc. 19, Ex. 13, p. 23.)  Whitsey

testified that, immediately following the Red Board violation, B.S. Tipton, Whitsey's Road Foreman, [3] told Whitsey that he was the best employee Tipton had and that he would receive only a 30-day suspension for the incident. (Doc. 23, Ex. 1 at ¶ 6, Whitsey Decl.; Doc. 19, Ex. 1, pp. 148-149.)

On the day of the incident, April 29, 2006, Norris Yard Trainmaster S.E. Smith ("Smith") conducted the field investigation into Whitsey's stop signal violation. (Doc 19, Ex. 19 at ¶18.)  Smith interviewed Whitsey and Williams, and, when Smith asked Whitsey why he did not slow the train in preparation to stop at the Lovick signal, Whitsey replied "that he was just not with it [that day]." (Doc. 19, Ex. 19 at ¶18; *id.*, Ex. 1, p. 111.) Whitsey testified that he told Smith he had been forced to work April 29, 2006, his off-day, and that he had started his shift with inadequate sleep and nourishment. (Doc. 23, Ex. 1 at ¶ 4.) (*Id.*).  Whitsey also told Smith that the Stop signal violation was his fault. (Doc. 19, Ex. 19 at ¶18; *id.*, Ex. 1, p. 111.)  The parties dispute whether Whitsey also stated that Williams was not at fault.  However, Whitsey testified that Williams had the ability to stop the train, but she did not.  (Doc. 23, Ex. 1 at ¶ 5.)

Following the field investigation, NSR initiated an investigative hearing and sent notification to Whitsey and Williams.  (Doc. 19, Ex. 19 at ¶ 14; *id.*, Ex. 20, Notification.) On May 18, 2006, Assistant Terminal Superintendent Roy E. Campbell ("Campbell")

---

[3]NSR notes in its reply brief that Mr. Tipton lacked capacity to make such a determination and that Mr. Tipton made the statement within an hour or two of the incident, prior to the completion of any investigation.  (*See* Doc. 19, Ex.19 at ¶ 22; *id.*, Ex. 1, p. 149.)

served as Hearing Officer at the investigative hearing.  (Doc. 19, Ex. 19 at ¶14.)  Whitsey

was represented at the hearing by two union officials.  (Doc. 19, Ex. 1, pp. 90-91.)  The

union representatives were permitted to ask questions, to cross examine witnesses, to

introduce documents and other evidence, and to object to evidence and documents offered

by the NSR.  (Doc. 19, Ex. 1, pp. 91, 93-94; *id.*, Ex. 21, p. 2.)  The union representatives

objected on Whitsey's behalf to evidence offered by NSR witnesses as to the speed of the

train with the result that Campbell dismissed the speeding charge. (Doc. 19, Ex. 1, p. 94.)

Whitsey testified he was not given an opportunity to present evidence and/or to discuss

the facts and circumstances relating to his employment history.  (Doc. 23, Ex. 1, at ¶ 3;

Doc. 19, Ex. 13, p. 41.)

**Whitsey's Work History**

Whitsey began working for NSR in 1998.  NSR had terminated him on two

occasions before his 2006 Stop signal violation.  (Doc. 19, Ex. 19 at ¶20; *id.*, Ex. 1, pp.

71-72; *id.*, Exs. 5 and 6, PLB Decisions)  Whitsey was first terminated in 2000 by his then

supervisor Steve Nichols, a white male, for allegedly failing to disclose a problem with

his ankle on his employment application. (Doc. 23, Ex. 1 at ¶ 7; Doc. 19, Ex. 1, pp. 63-

66.)  Nichols became aware of the alleged falsification when Whitsey injured his ankle

while playing basketball and missed work.  (*Id.*)  Whitsey informed Nichols of that injury,

a diagnoses of a foot disorder he received years earlier.  (*Id.*)  Whitsey appealed his

termination to the PLB, which overturned his termination and his claim for reinstatement,

without pay for lost time, conditioned upon his ability to pass a return-to-work physical.
(Doc. 19, Ex. 6.)

In 2004, Nichols again terminated Whitsey, this time for "job abandonment" after
Whitsey left work without the permission of the engineer who had been training Whitsey
to become an engineer. (Doc.23, Ex. 1 at ¶ 7; Doc. 19, Ex. 1 pp. 68-69.)  On findings that
NSR failed to warn Whitsey that his "Coach Engineer" lacked authority to release
employees before their shift ended, and that Whitsey had been "less than truthful as to the
times he left early," the PLB modified Whitsey's discipline of discharge to "time out of
service."  (Doc. 19, Ex. 5, pp. 2-3.)  Whitsey was reinstated.

**Whitsey's Termination for the 2006 Red Board Violation**

Campbell had the authority to, and did, terminate Whitsey at the conclusion of the
investigative hearing.  (Doc. 19, Ex. 13, p. 33.)  Campbell stated that he had reviewed the
two prior PLB decisions and Whitsey's career service record.  (Doc. 19, Ex. 13, pp. 44-
46.)   Whitsey's termination letter, (doc. 19, Ex. 18), stated that Whitsey was terminated
because of his "responsibility in connection with passing a Stop signal; the letter does not
state that Whitsey's work history factored into the termination decision.  (*See* Doc. 19,
Ex. 13, p. 55.)  NSR now states that "because of his responsibility for the Lovick Stop
signal violation" and "his previous disciplinary record, Whitsey was [terminated and] not
offered a suspension and waiver."  (Doc. 19, Ex. 19 at ¶¶ 21-22.)  NSR acknowledges
that at the investigative hearing Whitsey was not made aware that his work history would

be considered, but it contends that Whitsey, knowing his own record, should have clarified the events of the prior terminations as he saw fit.  (Doc. 19, Ex. 13, pp. 41-42.) NSR also acknowledges that Whitsey's termination letter did not communicate all of its reasons for the decision.  (Doc. 19, Ex. 13, p. 55.)  Whitsey testified that the termination decision had been pre-determined prior to hearing any of the evidence presented and points out that, while on break at the hearing, he overheard Campbell remark, in response to inquiry whether Whitsey should be reinstated, "I wish I could, but it is out of my hands."  (Doc. 23, Ex. 1 at ¶ 10.)

Whitsey and his union appealed the termination, both to higher NSR management, which upheld the decision, and then to the PLB.  (Doc. 19, Ex. 19 at ¶ 24.)  The PLB considered the following claims offered in mitigation by Whitsey: 1) because of his seniority he should not have been forced to take the assignment on his day off;  2)  he was inexperienced; and 3)  train 22E was over tonnage limits and, therefore, more difficult to stop.  (Doc. 19, Ex. 26, pp. 3-4.)  The PLB rejected the first argument, stating that "[o]nce [Whitsey] accepted the assignment, he was governed by all the applicable rules . . . ." (*Id.*)  Discounting the second argument, the PLB found that "Whitsey had no more or less training than every other engineer going through the program . . . [and if] he was not qualified at this point . . .it may be because he does not have the aptitude."  (*Id.*, p. 4.) The PLB also found the third argument unpersuasive, pointing out that tonnage limits affect pulling power or tracktive capacity of engines and not stopping power.  (*Id.*)  In

conclusion the PLB found "no sound reason to modify the decision [NSR] ha[d] imposed." (*Id.*)  The PLB opinion did not preclude NSR from returning Whitsey to service, and, in fact, the opinion stated that if NSR believes that Whitsey's "career is worth salvaging by further training, that is their prerogative and decision to make." (*Id.*)

### Williams's Discipline for the 2006 Red Board Violation

Williams started working for NSR on May 29, 2003.  (Doc. 19, Ex. 19 at ¶ 20.) NSR states that "Conductor Williams was given a 34 day suspension because [Campbell] concluded that she did not bear the same degree of responsibility as Mr. Whitsey for [the April 29, 2006 Stop signal violation], and because she had no previous discipline on her record." (Doc. 19, Ex. 19 at ¶23; *id.*, Exs. 24 and 25.)  Whitsey asserts, however, that Williams admitted to having previously run through some switches.  (Doc. 23, Ex. 1 at ¶ 9.)  Williams's career service report shows one such incident, resulting in a ten-day deferred suspension.  (Doc. 19, Ex. 25, p. 33.)

### NSR's Red Board Violation Policy Change: "The Manion Notice"

Following Whitsey's termination for the April 29, 2006, Stop signal violation, NSR's Vice President of Operations, Mark D. Manion, sent a written notice ("Manion Notice"), dated September 26, 2006, to all NSR train crew employees throughout the Company, including Norris Yard and elsewhere in the Alabama Division. (Doc. 19, Ex. 19 at ¶¶ 27-28.)  The Manion Notice addressed the subject of Stop signal violations, noting that these infractions of the rules continued to occur despite NSR's past

11

compliance efforts.  (Doc. 19, Ex. 27, Manion Notice.)  Manion's Notice states:

"Employees who fail to comply with a stop indication are subject to dismissal.  The

disposition of employees dismissed for stop signal violations will be dictated by the

contract grievance procedure and arbitration."  (*Id.* )

**NSR's Post-Manion Notice Disciplinary Action**

NSR has discharged all employees found guilty of violating Stop signals after the

issuance of the Manion Notice on September 26, 2006, with the exception of Luther E.

Grisham, who voluntarily retired from service prior to his investigation. (Doc. 19, Ex. 19

at ¶33.)  NSR points out that those terminated in the period after the Manion Notice

included 13 white employees and 5 African-American employees. (*Id.* at ¶33.)  However,

all but two of those employees were returned to service by Public Law Boards.  Of the

two dismissals that the PLB upheld, one was African-American, Engineer Antonio M.

Green, and one was white, Engineer Stephen M. Davidson. (Whitsey's fourth

comparator).[4]  (*Id., p.* ¶34.)  There was one additional Stop signal violation in Alabama in

2009, and NSR dismissed the entire train crew, all of whom were African-American. (*Id.*

at ¶29.)[5]

---

[4]The record does not reflect why these two individuals were not returned to service by the PLB, as were the other employees discharged after the issuance of the Manion Notice.

[5]The record does not contain the details of this alleged violation or the resulting disciplinary action.  Likewise, the record is silent as to any appeals related to these discharges.

**Whitsey's Comparators**

Whitsey has identified seven white comparators:

1) Engineer Rodney Dobbs.  Dobbs, a white male, received a 30-day suspension and revocation of his engineer's certificate for a Red Board violation (passing stop signal) on March 31, 2005.  (Doc. 19, Ex. 28,  pp. 4-5.)  At the time, his work history included a deferred ten day suspension in 1998 for sideswiping and damaging engines.  (*Id.*, p. 5.)

2) Engineer David Pinegar.  Pinegar, a white male, received a 30-day suspension and a one-month revocation of his engineer certificate for a Red Board violation (passing stop signal) on April 30, 2005.  (Doc. 19, Ex. 28, pp. 4, 9.)  At the time, his work history included two disciplinary letters for other rule violations.  (*Id.*, p. 9.)  Also, Pingear received a 15-day suspension on June 3, 2005 for excessive absenteeism.  (*Id.*)

3) Engineer William C. Chappell.  Chappell, a white male, received a 30-day suspension and one month revocation of his engineer certificate for a Red Board violation (passing a stop indication) on August 10, 2005.  (Doc. 19, Ex. 28, pp. 4, 13.)  At the time, Chappell's work history included eight prior disciplinary actions, including two suspensions for mishandling trains and failing to comply with instructions.  (*Id.*, p. 13.)

4) Engineer Stephen M. Davidson.  Davidson, a white male, received a 30-day suspension and one-month revocation of his engineer certificate for a Red Board violation (passing stop signal) on September 20, 2005.  (Doc. 19, Ex. 28, pp. 4, 17.)  At the time, Davidson had received  three prior disciplinary actions, including two letters of

13

reprimand, one for a derailment, and a five-day suspension for improper train handling. (*Id.*, p. 17.)

5) Conductor Steven Flanagan, Jr.  Flanagan, a white male, had two Red Board violations (both stop violations) in 2005.  He received a 30-day suspension for the first violation, and received a 90-day suspension for his second violation, which occurred less than three months later. (Doc. 19, Ex. 28, pp. 4, 19.)

6) Engineer Danie Garner.  Garner, a white male, received a 30-day suspension for a Red Board violation (passing stop signal) on December 9, 2005.  (Doc. 19, Ex. 28, pp. 4, 21.)  He was not terminated by NSR despite his having previously received a 60-day suspension for safety violations and a 30-day suspension later reduced to 15 days resulting from a derailment.  (*Id.*, 21.)  In December 2006, post-Manion Notice, Garner received another 30-day suspension for failing to properly handle a train. (*Id.*).

7) Engineer M.C. Allen.  Allen, a white male, received a 30-day suspension for a Red Board violation (passing stop signal) on June 26, 2006.  (Doc. 19, Ex. 28, pp. 24, 35.) At that time, Allen's work history included a 15-day deferred suspension for a side collision, a 30-day suspension for a prior Red Board violation, and two other reported violations, including failing to stop short of a switch and running through a switch.  (*Id.*, p. 35.)

## III  DISCUSSION

In this action, Whitsey alleges NSR terminated him because of his race in violation of 42 U.S.C. § 1981.  As proof of defendant's discriminatory motive, plaintiff alleges white employees accused of the same conduct were not terminated.

**Standard for Section 1981 Liability**

The Eleventh Circuit has held that section 1981 race discrimination claims are analyzed in the same manner as Title VII race discrimination claims.  *See Shields v. Fort James Corp.,* 305 F.3d 1280, 1281 (11th Cir. 2002); *Standard v. A.B.E.L.* Services, 161 F.3d 1318, 1330 (11th Cir. 1998); Turnes *v. AmSouth Bank, N.A.,* 36 F.3d 1057 (11th Cir. 1994).  When a plaintiff, as in this case, offers only circumstantial evidence to prove a discrimination claim, courts use the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v.* Green, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under this framework, the plaintiff must first prove a *prima facie* case, creating a presumption of discrimination, by showing that he was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class.  *See McDonnell Douglas*, 411 U.S. at 802; *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767–68 (11th Cir. 2005).  Once the plaintiff has proven a *prima facie* case, the burden shifts to the defendant to articulate one or more legitimate,

15

nondiscriminatory reasons for its employment action.  *See Burdine*, 450 U.S. 248, 253

(1981).  If the defendant accomplishes this, the burden shifts back to the plaintiff to prove

by a preponderance of the evidence that the defendant's alleged reason or reasons were a

pretext for unlawful discrimination.  *See id.* **a. Prima Facie Case**

NSR argues that Whitsey cannot establish two of the requisite prima facie

elements.  The *McDonnell Douglas* framework for proof of a prima facie case with

circumstantial evidence requires Whitsey to prove: 1) that he belongs to a protected class;

2) that he was subjected to an adverse employment action; 3) that similarly situated white

employees were treated more favorably; and 4) that he was qualified to do the job.

*McDonnell Douglas*, 411 U.S. 792, 802 (1973).

**1) Job qualification:**

NSR asserts that Whitsey was not qualified for his job and therefore fails in the

proof of his prima facie case.  (Doc. 18, pp. 20-21.)  NSR states that the decision of the

Public Law Board supports this conclusion.  Specifically, NSR points to Whitsey's

claims, stated at the investigative hearing, that he lacked experience to properly perform

the job and that this was reflected in his use of the dynamic brake when the automatic

brake should have been employed.  (Doc. 18, p. 31.)  NSR contends that the opinion of

the PLB – that Whitsey had sufficient time and training to become competent, and that "if

he was not qualified at this point . . . it may be because he lacks aptitutde" – is conclusive

proof that Whitsey was not qualified.  (*Id.*)

16

NSR's argument is unpersuasive.  As Whitsey points out, (doc. 22, p. 10), employee performance in the job position for a period of time is sufficient to demonstrate qualification for the job.  *See Young v. General Food Corp.*, 840 F.2d 825, 829-30 n.3 (11th Cir.), *cert. denied*, 488 U.S. 1004 (1989) (reasoning that in cases where a plaintiff has held a position, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred); *Bates v. Greyhound Lines, Inc.*, 81 F. Supp. 2d 1292, 1299 (N.D. Fla. 2000) (observing that a plaintiff met the prima facie burden of showing qualification if she had performed the job in question); *EEOC v. Kloster Cruise Limited*, 897 F. Supp. 1422, 1427 (S.D. Fla. 1995) (concluding an individual who performed the job in question was qualified for purposes of a prima facie showing).

NSR argues that *Bates* is irrelevant because, in that case, "job qualification was not disputed."  (Doc. 24, p. 7, n.2.)  However, in *Bates,* the court noted that the plaintiff "had performed [her] job well for an extended period." *Bates*, 840 F.2d at 1299.  The *Bates* court also determined that the plaintiff was fired for a violation of procedure (lost bank deposit) and that she had, despite an otherwise very good record, two prior instances of missing deposits.  The termination of Bates for a rule violation did not negate the proof that the employee met the qualification prong of the prima facie test for discrimination. *Id.*  NSR also argues that Whitsey's reliance on *Young* does not afford him the presumption of job qualification based upon length of time in the position.  (Doc. 24, p. 7.)  However, a complete reading of *Young* instructs that the presumption of qualification

attaches where plaintiff has held a position for a significant period of time and, if job performance is an issue, the focus of that inquiry occurs at the proof of pretext stage. *Young*, 840 F.2d at 830 n.3. Therefore, NSR's argument fails on this point; Whitsey has met the prima facie showing of job qualification.

**2) Similarly situated comparators:**

Likewise, Whitsey has provided ample evidence that similarly situated employees outside the protected class were treated more favorably for the same conduct that precipitated his termination. Whitsey's comparator evidence is comprised of six engineers and one conductor, all white employees. Each of the comparators committed Red Board violations for passing a Stop signal, and each received 30-day suspensions for their actions.

To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999). The most important factors "in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed." *Jones v. Gerwens,* 874 F.2d 1534, 1539-40 (11th Cir.1989).

NSR attempts to discredit Whitsey's comparator evidence on two fronts, and asserts: 1) considering employee work history as part of the calculus in the termination decision, none of Whitsey's comparators had prior terminations, as did Whitsey; and 2) considering its treatment of employees who committed Red Board violations during the period which includes the year preceding Whitsey's incident though the present, NSR has treated some members of the protected class as favorably as Whitsey's comparators. (Doc. 18, pp. 21-27.)  NSR's arguments are not persuasive; the court finds that Whitsey's comparator evidence satisfies the prima facie test.

First, Whitsey's comparators are nearly identical given the misconduct at issue, a Red board violation, and the ultimate discipline for misconduct that is part of their employment history.  While NSR acknowledges that Whitsey's prior terminations were reversed and re-characterized by the PLB as a suspension without pay, (doc. 18, p. 26), NSR now argues that Whitsey's prior work history is distinguishable from that of his comparators.  NSR points out that, of those employees committing red board violations prior to the "Manion letter," only the plaintiff had a record which included two prior terminations.  (Doc. 18, p. 24.)  This raises the question of which discipline should be used for purposes of comparing employment history–the initial discipline, or the discipline that was carried out.  The determinations of the PLB are, undeniably, a part of Whitsey's employment history.  A jury could reasonably conclude that NSR erroneously caused Whitsey's earlier terminations, and, given that, after the hearing by the PLB, the

19

defendant re-cast the terminations as "suspensions without pay," Whitsey should not later be penalized by a substantially more derogatory view of his record.

NSR also contends that the PLB decision to reinstate Whitsey without back pay is indicative of "some degree of wrongdoing." (Doc. 18, p.11 at ¶ 31; Doc. 19, Ex. 1, p. 72, Whitsey Depo.) Whitsey does not challenge defendant's statement, but clarifies the circumstances that factored into the PLB's decision, and further argues that his prior misconduct is not as egregious as the prior, safety related, misconduct for which NSR disciplined his comparators. (Doc. 22, p. 4 at ¶ 31 & p. 15.) The court notes that, regarding the second incident, the PLB found wrongdoing on the part of NSR. (Doc. 19, Ex. 5, p. 3.) The PLB determined that the actions of NSR were "harsh and unreasonable" and that it "singled out" Whitsey for termination contrary to its "general practice to warn or reprimand an employee before discharge unless the violation is extremely serious." (*Id.*) Thus, drawing all reasonable inferences in Whitsey's favor, his prior work history, which includes a record of suspensions, is nearly identical to his compartors, whom NSR disciplined less harshly for Red Board violations, despite prior suspensions.

Likewise, NSR fails in its second effort to disprove that Whitsey has met his prima facie proof that members outside the protected class received more favorable treatment for the same violation of a company rule – that is, their failure to stop. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield,* 115 F.3d at 1562 (citations omitted).

Here, Whitsey's burden is to show the existence of *a* similarly situated employee outside the protected class who received more favorable treatment.  *See id.* (Emphasis added). NSR urges the court to apply another test.  NSR directs the court to *Givens v. Chambers*, which states that where an employer has treated members within, and outside, of the protected class identically, such action precludes a claim of discrimination by a member of the protected class.  548 F. Supp. 2d 1259, 1273 (M.D. Ala. 2008) (citing *Tyndall v. Dynamic, Inc.*, 997 F. Supp. 721, 725 (E.D. Va. 1998))  *Givens* is not factually analogous. In that case,  all members of the protected class received like treatment – the employer excused all male <u>and</u> all female employees from training meetings related to the issue for which plaintiff was terminated.[6]  *Id.*  The treatment given *all* employees must be identical before a claim by one is precluded.  *See id.*; *EEOC v. Clay Printing Co.*, 955 F.2d 936 (4th Cir. 1992) (determining that where each of four employees was placed on straight commission without expenses or company provided vehicle , "no particular employee can claim that difficult working conditions signify the employer's intent to force that individual to resign").  In contrast, here, during the period of time up to and including the event of Whitsey's termination, NSR admits that some employees were suspended, while others were terminated, for Red Board violations.

NSR also overstates its "favorable" treatment of similarly situated members of the protected class by omitting details pertinent to disciplinary decisions.  Specifically, black

---

[6]The court also determined that the action, or inaction, complained of did "not amount to an adverse employment action."  *Givens*, 548 F. Supp. 2d at 1273.

Engineer Aaron Smith, Jr., as well as his white conductor, Monty Quinn, and white conductor-trainee, Blake Mashburn, received no discipline for the Stop signal violation committed by that crew on January 18, 2006 near Lincoln, Alabama, because lighting conditions were determined to contribute to their failure to see the Stop signal.  (Doc. 19, Ex. 19 at ¶31.)

Likewise, NSR differentiates between individual Stop signal Red Board violations–pointing out specific details of Whitsey's incident and suggesting that, because no comparators committed a Stop signal violation in like manner, Whitsey fails to offer sufficient evidence.  (Doc. 24, p. 12.)  While the court is required to consider the quantity and quality of the comparator's misconduct, this should not be construed so narrowly as to require the court to differentiate, for example, between an error that caused a train to exceed a stop signal by 200 feet and an error resulting in a 500 foot overage– this would be a completely unworkable test.  Although there are distinctions in the incidents that a jury may find sufficient for the difference in treatment, NSR charged each of Whitsey's comparators with a "Red Board violation" for their failure to comply with a Stop signal, and several white comparators received more favorable treatment.  *See Rouix v. City of Atlanta*, 520 F.3d 1269, 1280 (11th Cir. 2008) (finding employee was not a valid comparator where employee was not charged with the same offense).

Finally, in its effort to demonstrate nondiscriminatory treatment of Whitsey, NSR may not rely on disciplinary actions taken after it changed its policy with the issuance of the Manion Notice.  *See Roy v. Broward Sheriff's Office*, 160 Fed. Appx. 873, 874 (11th

Cir. 2005) (restricting comparator evidence to employees charged under the same policy provisions); *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005) ("A similarly situated employee is one who '. . . is subject to the same standards governing performance evaluation and discipline.'") (citation omitted); *Wooton v. Board of Trustees, Florida A & M Univ.*, 426 F. Supp. 2d 1261, 1266 (N.D.Fla. 2006) (discounting proffered comparator evidence on the basis that policies change, thus circumstances were not similar); *see also Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1185-87 (11th Cir. 1984) (concluding that an African-American plaintiff who was replaced by another African-American after termination for violation of work rule failed to make out a prima facie case of race discrimination because he did not meet his burden of showing that a white employee in *similar circumstances* was retained while he was fired).

In sum, Whitsey has met his prima facie burden. The court turns to the analysis of NSR's proffered nondiscriminatory reason for its actions and Whitsey's allegations of pretext.

**b. Legitimate, Nondiscriminatory Reasons**

NSR gives two reasons for Whitsey's termination. In its brief in support of its motion for summary judgment NSR argues that it "proved a solid non-discriminatory reason for terminating Mr. Whitsey's employment because of his responsibility for the April 29, 2006 Red Board violation." (Doc. 18, p. 28.) NSR points only to Whitsey's ineptitude in the operation of the train on that day, and states that, under *Bogle v. Orange*

*County Board of County Commissioners*, 162 F.3d 653, 657 (11th Cir. 1998), a violation of company rules constitutes a legitimate non-discriminatory reason for adverse employment action.  (*Id.*)

In its reply brief, however, NSR adds that the "totality of [Whitsey's] misconduct," which "includes both the details of just how far he exceeded the Stop signal, *as well as the details of his prior record*," distinguishes Whitsey from his compartors.  (Doc. 24, p. 12.)  Given that, and the numerous statements by NSR that Whitsey's Red Board violation as well as his work history were the basis for the termination decision, (*see* doc. 19, Ex. 19 at ¶ 22, Campbell Decl.; doc. 19, Ex. 13, p. 33.), the court will address both of defendant's non-discriminatory reasons for his termination.

**c. Pretext**

Whitsey argues that NSR's reasons for terminating Whitsey are pretextual.  A plaintiff raises a genuine issue of material fact concerning pretext if the plaintiff casts sufficient doubt on the defendant's proffered reason to permit a reasonable fact finder to conclude that the employer's proffered reason was not what actually motivated its conduct.  *Corbitt v. Home Depot U.S.A.*, No. 08-12199, 2009 WL 4432654, at * 20 (11th Cir. Dec. 4, 2009) (citing *Crawford v. Carroll*, 599 F.3d 961, 976 (11th Cir. 2008)).  An employee may show pretext "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Jackson v. Alabama State*

24

*Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)).  "'A plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable.'"  *Id*. (quoting *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994)).  In reviewing a summary judgment motion, "'the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Id.* (quoting *Combs v. Plantation Patterns, Meadowcraft Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997).

In Whitsey's termination letter, and in its motion for summary judgment, NSR states that Whitsey was terminated for his responsibility in the failure to obey a Stop signal, a Red Board violation.  (Doc. 19, Ex. 18; Doc. 18, p. 28.)  Considering that proffered nondiscriminatory reason for termination, Whitsey's comparator evidence is sufficient to raise an inference of pretext.  In a period of just over one year, from 2005 up to the time of the policy change effected by the Manion Notice, eight crews (including Whitsey's) committed Red Board violations for failure to comply with Stop signals.  Of those eight crews, six engineers, all white, were given 30 day suspensions.  The other engineer, an African American, wa*s* neither discharged nor suspended because the investigation into the facts of the incident revealed that lighting conditions played a significant role in the crew's failure to properly stop the train.  From this, Whitsey has

25

created a fact question as to the credibility of NRS's proffered non-discriminatory reason for Whitsey's termination.

If, on the other hand, the court considers that NSR's proffered nondiscriminatory reason for terminating Whitsey rests on both the violation and Whitsey's work history, then observing the work history of Whitsey's comparators reveals inconsistencies in NSR's proffered reason sufficient to create an inference of pretext. As discussed above–Whitsey's "terminations" did not involve the safe operation of trains and the ultimate discipline received was a suspension. In contrast, compartors with suspensions for unsafe operation of trains were merely suspended for a later Red Board violation. *See Opsatnik v. Norfolk Southern Corp.*, 335 Fed.Appx. 220, 223 (3d Cir. 2009) (concluding that "a non-operational violation concerning absenteeism or substance abuse cannot be considered of 'comparable seriousness' to an operational violation such as speeding"). These actions are sufficient to demonstrate the "implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" from which a reasonable factfinder could find them unworthy of credence. *Corbitt*, 2009 WL 4432654, at * 20 (quoting *Combs v. Plantation Patterns, Meadowcraft Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997). Thus, NSR is not entitled to judgment as a matter of law.

**d. Dispositve Effect of the Public Law Board Opinion**

Finally, NSR contends that the decision of the Public Law Board is dispositive as to the reason for Whitsey's termination. (Doc. 18, p. 29.) NSR makes two arguments: 1)

that by upholding Whitsey's termination, the PLB decision "conclusively supports" that NSR's stated nondiscriminatory reason carries no suggestion of pretext; and 2) that the PLB decision supports the conclusion that Whitsey was not qualified for his job and thus fails in the proof of his prima facie case.  (*Id.*, pp. 29-32.)  The court finds these arguments to be unavailing.

First, the PLB opinion states that the Board "[found] no reason to modify the decision [NSR] has imposed," and that NSR remained free to "salvage Whitsey's career with "further training."  (Doc. 18, p. 29.)  In an effort to demonstrate conclusive support of the absence of pretext from the Board's action, or inaction, NSR misapplies *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328 (11th Cir. 1999).  NSR contends that in *Stimpson* the Eleventh Circuit reversed a jury verdict in favor of the plaintiff on charges of sex discrimination "based in significant part on the independent Civil Service Board's decision upholding her termination."  (Doc. 18, p.27)  However, in *Stimpson*, the Civil Service Board reviewed a *recommendation* by the City to terminate a police officer; and, the Board, not the employer, made the termination decision.  *Stimpson*, 186 F.3d at1331 (noting that "under Alabama law, the City has no power to terminate police officers, such as [the plaintiff]").  The court addressed the issue of whether the plaintiff had proven that the "recommendation directly resulted in the discharge," and held that the plaintiff had not demonstrated that the City's animus influenced the Board's decision, thus, the causal

link had been broken. *Id.* at 1332. In this case, however, the PLB did not make the decision to terminate Whitsey – instead, its authority is appellate in nature.

NSR's also relies upon *Collins v. New York City Transit Authority*, 305 F.3d 113, 117-119 (2nd Cir. 2002) and urges this court to find an absence of pretext, as a matter of law. While *Collins* is factually analogous to this case, to the extent that the employer's termination decision was followed by appeal to an arbitration board, it does not support NSR's contention that the decision of the appellate body is dispositive as to the issue of pretext. On appeal, the *Collins* court affirmed summary judgment in favor of the employer based upon the cumulative probative weight of the evidence *and* the final determination by the Arbitration Board. *Collins*, 305 F.3d at 119 (Emphasis added). The court's decision rested upon more than the Board's decision. In fact, the court summarized: "[A] negative arbitration decision rendered under a CBA does not preclude a Title VII action by a discharged employee." *Id.* (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60, 60 n.21 (1974) ("The arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate.")). Thus, while *Collins* stands for the proposition that an arbitration decision may be probative, it does not hold that an arbitration decision is dispositive on the issue of pretext. *See id.*

Turning to NSR's second argument regarding the effect of the PLB decision, the court has already addressed and rejected NSR's assertion that Whitsey was not qualified for his job. In sum, Whitsey has offered sufficient evidence from which a jury could infer

that NSR's stated nondiscriminatory reasons for his termination are pretextual and that

NSR's termination decision was motivated by racial animus.

## IV CONCLUSION

For the foregoing reasons, the court is of the opinion that NSR's Motion for

Summary Judgment is due to be denied.  An order denying NSR's motion will be entered

contemporaneously with this Memorandum Opinion.

**DONE** this 31st day of March, 2010.


*Sharon Lovelace Blackburn*
_____
**SHARON  LOVELACE  BLACKBURN**
**CHIEF UNITED STATES DISTRICT JUDGE**