

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| JEREMIE WHITSEY, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| vs. | } | CASE NO. 2:08-cv-01632-SLB |
| | } | |
| NORFOLK SOUTHERN | } | |
| RAILWAY COMPANY, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

This case is currently before the court on defendant Norfolk Southern Railway Company's ("NSR") Motion For Reconsideration.  (Doc. 33.)[1]  In the Motion for Reconsideration, NSR asks that the court reconsider its Memorandum Opinion and Order of March 31, 2010, (docs. 31 & 32), which denied NSR's Motion for Summary Judgment, (doc. 17).[2]  (Doc. 33 at 1.)  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court finds that NSR's Motion

---

[1]  Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

[2]  "[A] district court has the inherent power to reconsider and revise its orders in the interests of justice." *Delta Health Group, Inc. v. U.S. Dep't of Health & Human Servs.*, 459 F. Supp. 2d 1207, 1227 (N.D. Fla. 2006) (citations omitted). "Therefore, in filing . . . [its] motion for relief, [NSR] . . . is actually asking the court to exercise its 'inherent power' to modify an interlocutory order at any time prior to final judgment." *Bullock v. Widnall*, 1997 WL 1876544, at *1(M.D. Ala. Aug. 12, 1997)(citing *Calpetco 1981 v. Marshall Exploration*, 989 F.2d 1408, 1414 (5th Cir. 1993); *Bon Air Hotel v. Time*, 426 F.2d 858, 862 (5th Cir. 1970); *Robinson v. Worthington*, 544 F. Supp. 956, 961 (M.D. Ala. 1982); Wright, Miller & Kane, 11 FED. PRAC. & PROC. CIV.2D § 2852 (1995)).

for Reconsideration is due to be granted.

## I. BACKGROUND AND PROCEDURAL HISTORY

In its Motion for Summary Judgment, NSR argued that Whitsey could not satisfy two *prima facie* elements: that is, demonstrating that he was qualified to perform his job as a train Engineer, and/or, that other similarly situated comparators had been guilty of the same misconduct, (failure to obey a stop signal – a Red Board violation), and received more favorable treatment. (Doc. 18 at 17-24.) Turning to the issue of pretext, NSR argued that Whitsey could not overcome its "solid non-discriminatory reason for terminating Whitsey's employment because of his responsibility for the April 29, 2006 Red Board violation" as evaluated in light of his previous disciplinary record. (Doc. 18 at 28-32.) As support, NSR argued that Whitsey's comparators neither ran a stop signal by the same distance nor shared a similar work history.[3] (*Id.*) The court disagreed, and entered a Memorandum Opinion and Order denying NSR's Motion for Summary Judgment. (*See* docs. 31 & 32.) The court found that Whitsey presented sufficient evidence to establish the two *prima facie* case elements challenged by NSR. That is, the court found that Whitsey made a *prima facie* showing that he was qualified to perform his job and that other similarly situated comparators had been guilty of the same misconduct and received more favorable treatment. (Doc. 31 at 16-23.) As to NSR's preferred

---

[3] NSR also argued that the decision of the Public Law Board ("PLB"), upholding NSR's termination decision, was dispositive as to NSR's reason for termination. (Doc. 18 at 29.) NSR does not raise this issue in the present Motion for Reconsideration.

reasons for Whitsey's termination, the court found that NSR had articulated a legitimate,

non-discriminatory reason for Whitsey's termination; namely, for his responsibility in

connection with the 2006 Red Board violation as evaluated in light of his previous

disciplinary history.  (Doc. 31 at 23-24.)  Turning to the issue of pretext, the court found

that Whitsey's comparator evidence was sufficient to raise a factual question as to the

credibility of NSR's proffered reason for his termination.  (Doc. 31 at 22-26.)

In its Motion for Reconsideration, NSR reasserts that Whitsey has failed to present

comparator evidence which creates a triable issue as to pretext.  In addition, NSR, for the

first time, argues that the court lacks subject matter jurisdiction because the Railway

Labor Act ("RLA"), 45 U.S.C. § 151-188, preempts or precludes Whitsey's

discrimination claims.  (Doc. 33 at 9-17.)

## II. DISCUSSION

The Eleventh Circuit has held that race discrimination claims brought pursuant to

42 U.S.C. § 1981 are analyzed in the same manner as Title VII race discrimination

claims.  *See*, *e.g.*, *Shields v. Fort James Corp.,* 305 F.3d 1280, 1282 (11th Cir. 2002)

(quoting *Standard v. A.B.E.L. Services*, *Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

When a plaintiff, as in this case, offers only circumstantial evidence to prove a

discrimination claim, courts use the burden-shifting framework established by the

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas*

*Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under this

framework, as applied in the disciplinary context, the plaintiff must first prove a *prima facie* case, creating a presumption of discrimination, by showing that he was "a member of a protected class" and "either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Jones v. Gerwens,* 874 F.2d 1534, 1539-40 (11th Cir. 1989) (citation omitted); *see McDonnell Douglas*, 411 U.S. at 802; *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767-68 (11th Cir. 2005).  Once the plaintiff has proven a *prima facie* case, the burden shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its employment action.  *See, e.g.,* *Burdine*, 450 U.S. at 253 (citation omitted); *Vessels*, 408 F.3d at 767-68 (citation omitted).  If the defendant accomplishes this, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's alleged reason or reasons were a pretext for unlawful discrimination.  *See, e.g.,* *Burdine*, 450 U.S. at 253 (citation omitted); *Vessels*, 408 F.3d at 768 (citation omitted)

### A. Prima Facie Case

The *McDonnell Douglas* framework for proof of a *prima facie* case with circumstantial evidence requires Whitsey to prove: (1) that he was qualified to do the job; (2) that he was subjected to an adverse employment action; (3) that he belongs to a protected class; and (4) that similarly situated employees outside the protected class were

4

treated more favorably.  *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984) ("[A] plaintiff fired for misconduct makes out a prima facie case . . . if he shows that he was qualified for the job from which he was fired, and that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.") (citations and quotations omitted).  In the Memorandum Opinion denying NSR's Motion for Summary Judgment, the court found that Whitsey established a prima facie case of discrimination on the basis of his race.  (Doc. 31 at 16-21.)  As noted above, in its initial briefs in support of its Motion for Summary Judgment, NSR argued that Whitsey could not establish two of the required elements for a *prima facie* case.  First, NSR argued that Whitsey was not qualified to perform as a train Engineer.  (Doc. 18 at 21 & 31-32.)  Second, NSR argued that Whitsey failed to present evidence that similarly situated white employees were treated more favorably for the same misconduct that resulted in his termination. (*Id.* at 20-28.)

Although NSR in its Motion for Reconsideration challenges only the court's decision with regard to pretext, the court finds that reconsideration of whether Whitsey provided sufficient evidence that similarly situated white employees were treated more favorably is appropriate.  As to the other three elements of the *prima facie* case, the court adopts and incorporates by reference its prior Memorandum Opinion, (*id.*), and finds reconsideration as to those three elements, two of which were not challenged by NSR,

inappropriate.

"In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Roland v. United States Postal Service*, 200 Fed. Appx. 868 (11th Cir. 2006) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).  To show that the purported comparators are similarly situated, the plaintiff must establish that the employees are similarly situated "in all relevant respects."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (citation omitted).  "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999) (citing *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.")).  The most important factors in the disciplinary context are "the nature of the offenses committed and the nature of the punishments imposed."  *Jones*, 874 F.2d at 1539-40 (quoting *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir.), *cert. denied*, 472 U.S. 1021 (1985)).

Moreover, the Eleventh Circuit has recognized that "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of

employment discrimination." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001); *see Roland*, 200 Fed. Appx. at 872-73 (finding that the plaintiff's purported comparator was not similarly situated because neither of the decisionmakers who disciplined plaintiff had anything to do with the supervision or discipline of the purported comparator).   In *Jones v. Gerwens*, the plaintiff, an African-American police officer, was disciplined for, *inter alia*, making personal use of police truck and allowing an unauthorized person to ride with him in the truck.  874 F.2d at 1540-42.  The plaintiff argued that "numerous white officers made use of the Unit truck for personal business, or allowed unauthorized persons to ride with them, and received no punishment or substantially less than his one-day suspension without pay and subsequent transfer to patrol duties.  *Id.* at 1540-41.  In considering whether Jones presented sufficient evidence to make out a *prima facie* case, the Eleventh Circuit noted that "[c]ourts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."  *Id.* at 1541 (citations omitted).  On that basis, the court stated:

> A prima facie case of discriminatory motive must show that either Runnerstrom or Gerwens was aware of prior uses of the Unit truck by white officers for personal business or prior instances in which unauthorized persons had been permitted to ride in the truck, and that the known violations were consciously overlooked. For the purposes of this Title VII action, Sergeant Dietrich's previous tolerance of Unit truck use for personal business would be relevant only if it could be shown that either Runnerstrom or Gerwens knew of such practices and did not act to discipline rule violators. As Jones has failed to adduce evidence of knowledge on the part

of Runnerstrom or Gerwens, he has failed to make out a prima facie case of disparate treatment.

*Id.* at 1542 (footnotes omitted).

More recently, in *Morris v. Potter*, 251 Fed. Appx. 667 (11th Cir. 2007), the Eleventh Circuit affirmed the district court's grant of summary judgment in favor of the defendant, Potter, and against the plaintiff, Morris, because "[w]hile Morris established that she belonged to a protected class and suffered adverse employment action, she failed to demonstrate that similarly situated employees were treated more favorably." *Id.* at *1 (citation omitted). The court stated: "We have noted in a disparate discipline case that 'disciplinary measures undertaken by different supervisors may not be comparable for purposes of the Title VII analysis.'" *Id.* (quoting *Jones*, 874 F.2d at 1541). The court then recognized that although Morris pointed to other employees who had worn open-toed shoes and evaded punishment, "she did not establish that any of them were supervised by Billy Spence, the acting supervisor who dismissed her, or by Robert Johnson, the supervisor who previously instructed Spence to dismiss Morris if she wore open-toed shoes again." *Id.* (citing *Jones*, 874 F.2d at 1541). *Jones*, *Silvera*, *Morris*, and *Roland* all demonstrate that whether disciplinary measures were undertaken by different supervisors or decisionmakers, though not determinative, *see*, *e.g.*, *Anderson v. WBMG-42*, 253 F.3d 561, 565-66 (11th Cir. 2001), is a significant factor and can defeat the "similarly situated" prong of the *prima facie* case.

8

Whitsey's comparator evidence is comprised of six engineers and one conductor employed by NSR, all white employees, who allegedly "had discipline of a more serious nature than Mr. Whitsey." (Doc. 22 at 6.)  It was the general practice in NSR's Alabama Division at the time Whitsey was terminated (and some prior thereto) to issue a 30-day suspension for a Stop signal violation when (a) the employee had accepted the discipline and had waived a formal investigation, and (b) the employee's discipline record was "relatively clean." (doc. 19-9 ¶ 19.)  NSR contends that Whitsey was terminated in connection with his responsibility for a Red Board violation as evaluated in light of his previous disciplinary record. (Doc. 19-19 at ¶¶ 21-22; doc. 19 at 40-41.)  Thus, the court must compare the misconduct and disciplinary record of Whitsey, which NSR contends led to his termination, with the misconduct and disciplinary records of his purported comparators.

Whitsey committed a Red Board violation on April 29, 2006, while assigned as the engineer on a train out of Birmingham. (Doc. 19-19 ¶ 13.)  The conductor on the train with Whitsey at the time was Nashanta Williams ("Williams"), an African-American female. (*Id.*)  Whitsey and Williams were assigned to Train 22E traveling east from Birmingham, Alabama toward Atlanta, Georgia. (Doc. 19-19 ¶ 15; doc. 19-21 at 3.) When Train 22E reached an intermediate point called Diamond Head, at mile post 789.4, there was an "Approach" signal, indicating that they should reduce the train's speed and be prepared to stop at the next signal. (Doc. 19-19 ¶16.)  While the train was traveling

between Diamond Head and the next signal at Lovick, at mile post 787.7, a distance of 1.7 miles, Williams warned Whitsey at least twice that he was operating under an Approach signal. (*Id.*) Despite her warning, when the train approached the Stop signal at Lovick, it was going too fast to stop. (*Id.*; doc. 19-1 at 109-10.) When Whitsey saw the red Stop signal, he engaged the emergency brake system on the train; nevertheless, the train went past the Stop signal by 1,075 feet. (Doc. 19-19 ¶ 17.) Following an investigation and hearing, Whitsey was terminated on June 1, 2006, by then Norris Yard Assistant Terminal Superintendent, Roy E. Campbell, Jr. ("Campbell") (Doc. 19-19 ¶¶ 21-22; doc. 19-28 at 31.) Campbell's Declaration states that "because of his responsibility for the Lovick Stop signal violation" and "his previous disciplinary record, Whitsey was not offered a suspension and waiver." (Doc. 19-19 ¶¶ 21-22.)

At the time Whitsey committed the 2006 Red Board violation, he had two prior suspensions in his work history. (*See* doc. 19-28 at 31; docs. 19-5 & 19-6; doc. 19-19 ¶ 20; doc. 19-1 at 71-72.) Whitsey was first terminated in 2000, six years before he committed the Red Board violation, by his then supervisor Steve Nichols, a white male, for allegedly failing to disclose a problem with his ankle on his employment application. (Doc. 23-1 ¶ 7; doc. 19-1 at 63-66.) Nichols became aware of the alleged falsification when Whitsey re-injured his ankle while playing basketball and missed work. (*Id.*) Whitsey informed Nichols of that injury, as well as a diagnoses of a foot disorder he received before he twisted his ankle but after he started working for NSR. (*Id.*) Nichols

terminated Whitsey for "alleged conduct unbecoming an employee for falsifying a

medical condition." (Doc. 19-6 at 2; doc. 19-28 at 31.) Whitsey appealed his termination

to the Public Law Board ("PLB"), which reinstated his employment and recast his

termination as a suspension without pay. (Doc. 19-6.) Although the PLB overturned his

termination and sustained his claim for reinstatement, the PLB found that "the [CBA] . . .

was violated." (Doc. 19-6.) The PLB's decision is indicative of wrongdoing because the

PLB "did not reinstate . . . [Whitsey] with full back pay . . ., the logical result had the . . .

[PLB] believed that . . . [NSR's] discipline of . . . [Whitsey] was wholly unjustified."

*Ford v. Consolidated Edison Co. of New York*, 2006 WL 538116, at *17 (S.D.N.Y. Mar.

3, 2006). Whitsey's total off-work suspension in connection with the 2000 incident was

274 days. (Doc. 19-29.)

In 2004, two years before Whitsey committed the Red Board violation, Nichols

again terminated Whitsey, this time for "leaving early from jobs . . . on four separate

occasions . . . and [allegedly] submitting . . . incomplete or false training logs and

progress reports." (Doc. 19-5; doc. 23-1 ¶ 7; doc. 19-28 at 31.) Whitsey again appealed

his termination to the PLB. (*See* doc. 19-5.) The PLB reinstated Whitsey and modified

his discipline of discharge to a suspension without pay. (*Id.*) Despite the PLB's finding

that it "seem[][ed] harsh and unreasonable" for NSR to "suddenly and without warning

single out" Whitsey in light of "the general practice to warn or reprimand an employee

before discharge unless the violation is extremely serious," the PLB again found

11

wrongdoing on the part of Whitsey. (*Id.*) Specifically, the PLB found that Whitsey, when "confronted about such matter . . . was not entirely truthful[] as to the times at which he left early," and that Whitsey "failed to turn in proper paperwork concerning his training . . ., including evaluation sheets that were to be signed by his Coach Engineer." (*Id.*) Whitsey's total off-work suspension in connection with the 2004 incident was 242 days. (Doc. 19-28 at 31.)

Whitsey's first purported comparator is Rodney Dobbs ("Dobbs"), a white male. On March 31, 2005, Dobbs signed a waiver "accepting thirty (30) days actual suspension and one month revocation of [his] locomotive engineer's certificate" for a Red Board violation (passing stop signal) while serving as an engineer. (Doc. 19-28 at 5.) At the time Dobbs committed the 2005 Red Board violation, he had one prior suspension in his disciplinary history. (*Id.*) On June 10, 1998, seven years before he committed the Red Board violation, Dobbs received a ten day "Deferred Suspension" for "sideswipe and damage to engines . . . on fuel rack [at] Meridian yard." (*Id.*) There is no evidence as to whether Dobbs had any off-work suspension time in connection with the 1998 incident, and there are no additional material facts in the record concerning Dobbs's Red Board violation or the 1998 disciplinary action taken against him.

A comparison of the misconduct (a Red Board violation) and the disciplinary records of Whitsey and Dobbs reveals that Dobbs is not a proper comparator. Although Whitsey and Dobbs both committed a Red Board violation, for which Dobbs

received more favorable treatment, this similarity, standing alone, is insufficient.[4]  Unlike

Whitsey, Dobbs, had only one previous suspension in his disciplinary history.  That

suspension was a "Deferred Suspension" and was for a substantially less amount of time

then Whitsey's suspensions.  The nature and quality of the offenses in Whitsey's

disciplinary history are also of a different nature and quality than Dobbs's previous

offense.  Although Dobbs's previous violation was an operational violation, and,

therefore, *arguably* and *inferentially* more serious than the non-operational violations

contained in Whitsey's work history, they are different nonetheless.  *See Opsatnik v.*

*Norfolk Southern Corp.*, 335 Fed. Appx. 220, 223 (3d Cir. 2009) (concluding that "a non-

operational violation concerning absenteeism or substance abuse cannot be considered of

'comparable seriousness' to an operational violation such as speeding"). Thus, solely on

the basis of quantity, quality, the nature of the offenses, and the nature of the punishments

contained in Dobbs's employment history, Dobbs is not a proper comparator.  The court's

decision is bolstered by the fact that Dobbs, unlike Whitsey, was not disciplined by

Campbell for the Red Board violation he committed.  There is no evidence showing who

---

[4] In the absence of facts showing the circumstances underlying the Red Board violations committed by Whitsey's comparators, the court cannot determine whether the violations were of exactly the same quality as Whitsey's Red Board violation, which resulted in the train running past the stop sign by 1,075 feet.  Despite the absence of such facts, the court is still of the opinion that the Red Board violations committed by Whitsey and each of his comparators are sufficiently similar because, as the court stated in its prior Memorandum Opinion, (doc. 31), the "quality" inquiry "should not be construed so narrowly as to require the court to differentiate ... between an error that caused a train to exceed a stop signal by 200 feet and an error resulting in a 500 foot overage - this would be a completely unworkable test."  (*Id.* at 22.)

disciplined Dobbs, but there is evidence showing that it was not Campbell. The evidence

shows that Campbell was not involved in Dobbs's Red Board violation disciplinary

decision, had no first hand knowledge of why Dobbs received a thirty day suspension, and

had not been told by anyone why Dobbs was suspended, not terminated.  (Doc. 19-13 at

61-62.)  Therefore, the court finds that Whitsey and Dobbs are not similarly situated.

Whitsey's second purported comparator is David Pinegar ("Pinegar"), a white

male.  (Doc. 22 at 6.)  On April 30, 2005, Pinegar signed a waiver "accepting 30 days

actual suspension plus one month revocation of [his] locomotive engineer certificate" for

a Red Board violation (passing stop signal) while serving as an engineer.  (Doc. 19-28 at

9.)  At the time Pinegar committed the 2005 Red Board violation, he had no prior

suspensions in his disciplinary history.  (*Id.*)  The only previous disciplinary actions taken

against Pinegar were two letters addressing "[m]inor" violations, one of which occurred

in 2001, (*id.*),[5] and another which occurred in 2003 that concerned the "failure to separate

standing, uncoupled equipment by at least 50 feet before going in between to adjust

equipment while working as a foreman . . . ."  (*Id.*)   There are no additional material facts

in the record concerning Pinegar's Red Board violation or the two disciplinary letters.

A comparison of the misconduct (a Red Board violation) and the disciplinary

records of Whitsey and Pinegar reveals that Pinegar is not a proper comparator.  Although

---

[5] The record evidence regarding Pinegar's 2001 violation states in entirety: "START
letter - Minor - Rule 104(a)."  (Doc. 19-28 at 9.)

Whitsey and Pinegar both committed a Red Board violation, for which Pinegar received

more favorable treatment, this similarity, standing alone, is again insufficient.  Unlike

Whitsey, who had two suspensions in his work history, Pinegar had no previous

suspensions in his work history at the time he committed the Red Board violation.  The

nature and quality of the offenses in Whitsey's disciplinary history are also of a different

nature and quality than Pinegar's previous two offenses, which were classified as

"[m]inor" and resulted in disciplinary letters.  Whitsey has not presented evidence

explaining Pinegar's "[m]inor" violations or concerning their significance.  In the absence

of facts discussing Pinegar's previous disciplinary violations that did not result in

suspensions, the court finds that such violations are not comparable to Whitsey's

suspensions because the court cannot determine whether the conduct underlying the

"[m]inor" violations involved "mitigating circumstances" that distinguish the violations

from Whitsey's pre-Red Board violations.  *Opsatnik*, 335 Fed. Appx. at 224.  Thus, solely

on the basis of quantity, quality, the nature of the offenses, and the nature of the

punishments contained in Pinegar's disciplinary record, Pinegar is not a proper

comparator.  The court's decision is bolstered by the fact that Pinegar, unlike Whitsey,

was not disciplined by Campbell for the Red Board violation he committed.  There is no

evidence showing who disciplined Pinegar, but there is evidence showing that it was not

Campbell.  The evidence shows that Campbell was not involved in Pinegar's Red Board

violation disciplinary decision, had no first hand knowledge of why Pinegar received a

15

thirty day suspension, and had not been told by anyone why Pinegar was suspended, not terminated.  (Doc. 19-13 at 62-63.)  Therefore, the court finds that Pinegar and Whitsey are not similarly situated.

Whitsey's third purported comparator is William C. Chappell ("Chappell"), a white male.  (Doc. 22 at 6.)  On August 10, 2005, Chappell signed a waiver "accepting 30 days actual suspension and one month revocation of [his] locomotive engineer certificate" for committing a Red Board violation while serving as an engineer.  (Doc. 19-28 at 13.)  At the time Chappell committed the 2005 Red Board violation, he had two prior suspensions in his disciplinary history.  (*Id.*)  On July 10, 1998, seven years before he committed the Red Board violation, Chappell received five days actual suspension for "failure to comply with instructions in connection with operating in the vicinity of LeHigh . . . ."  (*Id.*)  On November 23, 1999, six years before he committed the Red Board violation, Chappell received ten days actual suspension for "improperly handling [a] train . . . ."  (*Id.*)  In addition to the above two suspensions that occurred pre-Red Board violation, Chappell also had several "Minor" violations in his disciplinary history at the time he committed the 2005 Red Board violation.  On April 30, 1987, Chappell received a letter of reprimand ("LOR") for violating "Birmingham Terminal Bulletin No. 1, Item No. 45" while serving as a switchman.  (*Id.*)  On December 23, 1993, Chappell received a LOR for "communications with other crews when meeting and passing trains. (*Id.*)  On August 2, 1996, Chappell received a LOR "regarding train handling procedures .

16

. . ." (*Id.*)  On March 30, 1999, Chappell received a LOR for "failure to correctly secure his train for layover at Finley Yard . . . ." (Doc. 19-28.)   On October 15, 2001, Chappell received a "[m]inor" violation for "making [a] shove move into storage track two that exceeded one-half the distance of last received radio transmission . . . ." (*Id.*)  And finally, on October 17, 2001, Chappell received a "[m]inor" violation for "running through [a] shop switch and making reverse movement . . . ." (*Id.*)   Chappell's total off-work time in connection with his pre-Red Board violation suspensions was fifteen days. (*Id.*)   There are no additional material facts in the record concerning Chappell's Red Board violation or the other violations for which disciplinary letters were sent or disciplinary action was taken against him.

A comparison of the misconduct (a Red Board violation) and the disciplinary records of Whitsey and Chappell reveals that Chappell is not a proper comparator. Whitsey and Chappell both committed a Red Board violation, for which Chappell received more favorable treatment.  They are also similar in that Chappell, like Whitsey, had two previous suspensions in his disciplinary history at the time Chappell committed the 2005 Red Board violation.  Chappell also had several "[m]inor" violations in his work history that did not result in suspensions, which arguably makes his work history more serious than Whitsey's work history.  However, Whitsey has not presented evidence explaining "[m]inor" violations and LORs or any evidence concerning their significance. Due to the absence of facts surrounding the "[m]inor" violations and LORs and also due

to the fact that some of Chappell's previous violations occurred more than ten years before he committed the 2005 Red Board violation, the court finds that Chappell's disciplinary violations that did not result in suspensions are not comparable to Whitsey's prior suspensions.  The court also notes that Chappell's fifteen days total off-work suspension time in connection with the violations contained in his work history at the time he committed the Red Board violation is substantially less than Whitsey's total off-work time resulting from his two prior suspensions.  Despite these differences, were the court deciding the "similarly situated" inquiry on the basis of quantity, quality, nature of the offenses, and nature of the punishments alone, the court would find that while the evidence in this regard is weak, it is sufficient to satisfy the *prima facie* case.  However, this already weak evidence of similarity is defeated by the court's consideration of the identity of the decision-maker.  Unlike Whitsey, Chappell was not terminated by Campbell.  The evidence shows that Campbell was not involved in Chappell's Red Board violation disciplinary decision, had no first hand knowledge of why Chappell received a thirty day suspension, and had not been told by anyone why Chappell was suspended, not terminated.  (Doc. 19-13 at 63-64.)  Therefore, the court finds that Whitsey and Chappell are not similarly situated.

Whitsey's fourth purported comparator is Stephen M. Davidson ("Davidson"), a white male.  (Doc. 22 at 7.)  On September 20, 2005, Davidson signed a waiver "accepting thirty (30) days actual suspension plus one month revocation of locomotive

engineer certificate" for committing a Red Board violation while serving as an engineer. (Doc. 19-28 at 17.)  At the time Davidson committed the 2005 Red Board violation, he had one prior suspension in his disciplinary history.  (*Id.*)  On October 21, 1985, twenty years before he committed the 2005 Red Board violation, Davidson was suspended for five days due to "improper train handling . . . ."  (*Id.*)   Davidson had also previously received two LORs at the time he committed the 2005 Red Board violation, one in 1977 and another in 1981.  The 1977 LOR concerned "operating at over 20 MPH [in a] curve restriction" and the 1981 LOR other concerned "derailment, damage, and delay."  (*Id.*) Davidson's total off-work time in connection with his pre-Red Board violation suspension was five days.  (Doc. 19-29.)  There are no additional material facts in the record concerning Davidson's 2005 Red Board violation, his previous suspension, or the two LORs.

A comparison of the misconduct (a Red Board violation) and the disciplinary records of Whitsey and Davidson reveals that Davidson is not a proper comparator. Although Whitsey and Davidson both committed a Red Board violation, for which Davidson received more favorable treatment, this similarity, standing alone, is yet again insufficient.  Unlike Whitsey, Davidson had only one previous suspension in his disciplinary history at the time he committed the Red Board violation.  That five day suspension was for a substantially less amount of time than Whitsey's suspensions, which resulted in a total off-work time of 516 days .  The nature and quality of the offenses in

Whitsey's disciplinary history are also of a different nature and quality than Davidson's offenses.  Although Davidson's previous suspension resulted from operational violations and is, therefore, *arguably* and *inferentially* more serious than the non-operational violations contained in Whitsey's work history, they are different nonetheless.  Moreover, Whitsey has not presented evidence explaining the LORs or any evidence concerning their significance.  Due to the absence of facts surrounding Davidson's two previous LORs, the court finds that the offenses committed by Davidson that resulted in LORs are not comparable to Whitsey's previous suspensions.  Thus, solely on the basis of quantity, quality, the nature of the offenses, and the nature of the punishments, Davidson is not a proper comparator.  Again, the court's decision is bolstered by the fact that Davidson, unlike Whitsey, was not disciplined by Campbell for the Red Board violation he committed.  There is no evidence showing who disciplined Davidson, but there is evidence showing that it was not Campbell.  The evidence shows that Campbell was not involved in Davidson's Red Board violation disciplinary decision, had no first hand knowledge of why Davidson received a thirty day suspension, and had not been told by anyone why Davidson was suspended, not terminated.  (Doc. 19-13 at 64-65.)  Therefore, the court finds that Whitsey and Davidson are not similarly situated.

Whitsey's fifth purported comparator is Steven Flanagan, Jr. ("Flanagan"), a white male.  (Doc. 22 at 7.)  On December 9, 2005, Flanagan signed a waiver "accepting 90 actual days suspension" for committing a Red Board violation while serving as a

conductor. (Doc. 19-28 at 19.)  At the time Flanagan committed the 2005 Red Board

violation, he had one prior suspension in his disciplinary history.  (*Id.*)  On September 19,

2005, the same year he committed the Red Board violation outlined above, Flanagan

signed a waiver "accepting thirty (30) days actual suspension" for a "[m]ajor" Red Board

violation while serving as a conductor.  (*Id.*)  Flanagan's total off-work time in

connection with his two Red Board violation suspensions was 120 days.  (*Id.*)  There are

no additional material facts in the record concerning either of Flanagan's Red Board

violations.

A comparison of the misconduct (a Red Board violation) and the disciplinary

records of Whitsey and Flanagan reveals that Flanagan is not a proper comparator.

Whitsey and Flanagan both committed a Red Board violation, for which Flanagan

received more favorable treatment.  Unlike Whitsey, Flanagan had only one suspension in

his disciplinary history at the time he committed the second 2005 Red Board violation.

The previous suspension, however, was a "[m]ajor" Red Board violation.  Thus, while the

quantity of their previous suspensions is different and the total off-work time resulting

from Flanagan's first Red Board violation was substantially less than Whitsey's total off-

work time resulting from his previous suspensions, the court nonetheless finds that

Whitsey's work history is "nearly identical" to Flanagan's.  Were the court deciding the

"similarly situated" inquiry on the basis of quantity, quality, nature of the offenses, and

nature of the punishments alone, the court would find that while the evidence in this

21

regard is weak, it is sufficient to satisfy the *prima facie* case.  However, this evidence of similarity is defeated by the court's consideration of the identity of the decision-maker. Unlike Whitsey, Flanagan was not terminated by Campbell.  The evidence shows that Campbell was not involved in Flanagan's Red Board violation disciplinary decision, had no first hand knowledge of why Flanagan received a ninety day suspension, and had not been told by anyone why Flanagan was suspended, not terminated.  (Doc. 19-13 at 64-65.)  Therefore, the court finds that Whitsey and Flanagan are not similarly situated.

Whitsey's sixth purported comparator is Danie Garner ("Garner"), a white male. (Doc. 22 at 7.)   On December 9, 2005, Garner signed a waiver accepting thirty days actual suspension and one month revocation of his locomotive engineer certificate for a Red Board violation while serving as an engineer.  (Doc. 19-28 at 21.)  At the time Garner committed the 2005 Red Board violation, he had two prior suspensions in his disciplinary history.  (*Id.*)  On March 14, 1986, nineteen years before he committed the 2005 Red Board violation, Garner signed a waiver and was suspended for sixty days for "passing track out of line ... without taking necessary actions for [the] protection and safety of the train."  (*Id.*)  On September 2, 1989, sixteen years before he committed the 2005 Red Board violation, Garner was suspended thirty days for the "derailment [of] four cars."  (*Id.*)  Garner appealed to the PLB, which "reduced [the] 30 day suspension ... to 15 days and payment of lost time." (*Id.*)   Garner's total off-work time in connection with his two Red Board violation suspensions was 75 days.  (*Id.*)  There are no additional material

facts in the record concerning either of Garner's Red Board violations or his two previous suspensions.

A comparison of the misconduct (a Red Board violation) and the disciplinary records of Whitsey and Garner reveals that Garner is not a proper comparator. Whitsey and Garner both committed a Red Board violation, for which Garner received more favorable treatment. Although Garner, like Whitsey, had two previous suspensions in his disciplinary history at the time he committed the 2005 Red Board violation, Garner's suspensions are dissimilar in that they occurred over fifteen years before Garner committed the Red Board violation. The nature and quality of the previous suspensions contained in Whitsey's work history are also different than those in Garner's work history. Likewise, the nature of the punishments for the violations in Garner and Whitsey's work histories are also different because Garner's total off-work suspension time was substantially less than Whitsey's. Although Garner's previous violations were operational violations and, therefore, *arguably* and *inferentially* more serious than the non-operational violations contained in Whitsey's work history, they are different nonetheless. Thus, solely on the basis of quantity, quality, the nature of the offenses, and the nature of the punishments, Garner is not a proper comparator. Again, the court's decision is bolstered by the fact that Garner, unlike Whitsey, was not disciplined by Campbell for the Red Board violation he committed. There is no evidence showing who disciplined Garner, but there is evidence showing that it was not Campbell. The evidence

shows that Campbell was not involved in Garner's Red Board violation disciplinary decision, had no first hand knowledge of why Garner received a thirty day suspension, and had not been told by anyone why Garner was suspended, not terminated.  (Doc. 19-13 at 67.)  Therefore, the court finds that Whitsey and Garner are not similarly situated.

Whitsey's seventh purported comparator is M.C. Allen ("Allen"), a white male. (Doc. 22 at 7-8.)  On June 28, 2006, Allen signed a waiver accepting thirty days actual suspension and thirty days revocation of his locomotive engineer's certificate for committing a Red Board violation while serving as an engineer.  (Doc. 19-28 at 35.)  At the time Allen committed the 2006 Red Board violation, he had two prior suspensions in his disciplinary history.  (*Id.*)  On September 1, 1995, eleven years before Allen committed the 2006 Red Board violation, Allen received fifteen days deferred suspension "in connection with [a] side collision and damage to equipment ...."  (*Id.*)  On January 23, 1998, eight years before the 2006 Red Board violation, Allen received thirty days suspension and thirty days revocation of his locomotive engineer's certificate for "failure to stop short of a banner obstruction ...."  (*Id.*)  Allen had also previously received an LOR and been involved in a "Minor" infraction at the time he committed the 2006 Red Board violation.  The LOR was received by Allen on September 20, 2004 "in connection with a run-through switch . . . ." while he was serving as a conductor, (*id.*), and the minor disciplinary action on August 5, 2004 was related to Allen's "failure to stop short of a switch that was not properly lined up for employee's movement."  (*Id.*)  Allen's total off-

24

work time in connection with his pre-Red Board violation suspension was thirty days. (Doc. 19-29.)  There are no additional material facts in the record concerning Allen's 2006 Red Board violation, his previous suspensions, the LOR, or the "[m]inor" disciplinary action.

A comparison of the misconduct (a Red Board violation) and the disciplinary records of Whitsey and Allen reveals that Allen is not a proper comparator. Whitsey and Allen both committed a Red Board violation, for which Allen received more favorable treatment.  Like Whitsey, Allen had two previous suspensions in his work history at the time he committed the 2005 Red Board violation.  However, the nature and quality of the previous suspensions contained in Whitsey's work history are different than those in Allen's work history.  Although Allen's previous violations were operational violations and are, therefore, *arguably* and *inferentially* more serious than the non-operational violations contained in Whitsey's work history, they are different nonetheless.  Whitsey has not presented evidence explaining "[m]inor" violations and LORs or any evidence concerning their significance.  In the absence of such facts, the court finds that Allen's "[m]inor" violation and violation resulting in the LOR are not comparable to Whitsey's previous suspensions.  Likewise, the nature of the punishments for the previous disciplinary violations committed by Whitsey and Allen are not similar because Allen's total off-work suspension time was substantially less than Whitsey's.  The court also notes that one of Allen's previous violations occurred more than ten years before he

committed the Red Board violation, whereas Whitsey's offenses, including the Red Board violation, all occurred within six years of one another.  Despite these differences, were the court deciding the "similarly situated" inquiry on the basis of quantity, quality, nature of the offenses, and nature of the punishments alone, the court would find that while the evidence in this regard is weak, it is sufficient to satisfy the *prima facie* case.  However, this already weak evidence of similarity is defeated by the court's consideration of the identity of the decision-maker. Unlike Whitsey, Allen was not disciplined by Campbell for the Red Board violation he committed.  There is no evidence showing who disciplined Allen, but there is evidence showing that it was not Campbell.  The evidence shows that Campbell was not involved in Allen's Red Board violation disciplinary decision, had no first hand knowledge of why Allen received a thirty day suspension, and had not been told by anyone why Allen was suspended, not terminated.  (Doc. 19-13 at 69-70.)  Therefore, the court finds that Whitsey and Allen are not similarly situated.

Although "demonstrating a *prima facie* case is not onerous ...[,]" Whitsey has not "establish[ed] facts adequate to permit an inference of discrimination." *Holifield,* 115 F.3d at 1562 (citations omitted).  To show that his comparators were similarly situated, Whitsey would have needed to show that his disciplinary record was "nearly identical" to the disciplinary records of his comparators and that Campbell was involved in, or at the very least aware of, the Red Board disciplinary violations committed by Whitsey's purported comparators.  Because Whitsey has not done so, as shown *supra*, Whitsey has

26

not carried his burden to show the existence of *a* similarly situated comparator.

Therefore, upon reconsideration, the court finds that Whitsey has not established a *prima facie* case and summary judgment in favor of NSR is appropriate.

**B. Legitimate, Nondiscriminatory Reasons**

Assuming that Whitsey has established a *prima facie* case by showing that Chappell, Flanagan, and Allen are proper comparators,[6] thus shifting the burden back to NSR, the court finds that NSR has articulated a legitimate, non-discriminatory reason for Whitsey's termination.  More specifically, the court finds that NSR's termination of Whitsey for his responsibility in connection with the 2006 Red Board violation, as evaluated in light of the details of his prior disciplinary record, is a legitimate, non-discriminatory reason sufficient to shift the burden back to Whitsey to show that such reason was pretextual.[7]

---

[6] The reason that court will assume that Chappell, Flanagan, and Allen, not Dobbs, Pinegar, Davidson, and Garner, are proper comparators is because Dobbs, Pinegar, Davidson, and Garner can be disqualified as comparators solely on the basis of quality, quantity, and the nature of the offenses and punishments in their disciplinary records, without reference to whether Campbell was involved in, or aware of, the discipline they received for committing a Red Board violation. .  (*See* Part II.A.)  To be clear, however, that Campbell was not involved in the discipline Dobbs, Pinegar, Davidson, and Garner received for committing Red Board violations, as discussed *supra*, supports the court's finding that they are not similarly situated comparators.

[7] The court adopts and incorporates by reference its previous Memorandum Opinion as it relates to NSR's proferred legitimate, non-discriminatory reasons for Whitsey's termination. (*See* doc. 31 at 23-24.)

**C. Pretext**

A plaintiff raises a genuine issue of material fact concerning pretext if the plaintiff casts sufficient doubt on the defendant's proffered reason "to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (citations and internal quotations omitted).  An employee may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (citation omitted).  "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994).  In reviewing a summary judgment motion, "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns, Meadowcraft Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citations and internal quotations omitted).

In the previous Memorandum Opinion denying NSR's Motion for Summary Judgment, the court found that Whitsey's comparator evidence "created a fact question as

to the credibility of [defendant's] proffered non-discriminatory reason for Whitsey's termination." (Doc. 31 at 25-26.) The court's conclusion rested on the fact that "[i]n a period of just over one year ... eight crews (including Whitsey's) committed Red board violations for failure to comply with stop signals[,]" and "[o]f those eight crews, six engineers, all white, were given 30 days suspensions." (Doc. 31 at 25.) Upon reconsideration, the court finds that Whitsey has not presented sufficient evidence from which a reasonable trier of fact could find that "a discriminatory reason more likely motivated" NSR or that NSR's "proffered explanation is [false or] unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (citations and quotations omitted).

In *Hankins v. Airtran Airways*, 237 Fed. Appx. 513 (11th Cir. 2007), the plaintiff, Hankins, argued that Airtran's decision to terminate her was pretextual based on, *inter alia*, evidence that other Airtran employees who engaged in similar acts of misconduct received more favorable treatment. *Id.* at 522. Hankins, a white female, argued that an African-American colleague of hers, Calvin Nared, engaged in a "fight" with a co-worker, and was not fired, whereas Hankins was fired for using "harsh language" to a colleague. (*Id.*) The court found that Hankins's evidence failed to establish pretext because Hankins was not a proper comparator. The court stated:

> We have made clear that, when a plaintiff seeks to point out a workplace comparator who was treated less severely than the plaintiff, the "quantity

and the quality of the comparator's misconduct [must be] *nearly identical* to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999) (emphasis added). Here, Hankins' discharge came not only after the altercation incident with Kerstetter, but also after two other incidents of misconduct over a short period of four months. These additional incidents-her strapping a suitcase into a passenger seat instead of the overhead bin, and her failure to properly check safety equipment-were both detailed in her file and were considered by Head in making the ultimate decision to terminate her. In light of that evidence, the alleged misconduct of Nared (a single fight with a co-worker, the facts of which are not known) is distinguishable from her misconduct, both in terms of quality and quantity. *See, e.g.*, *id.* at 1369 (finding that plaintiff has failed to show a similarly situated employee where each of the putative comparators "was involved in a single incident of misconduct, whereas [the plaintiff] committed at least four policy violations").

*Hankins*, 237 Fed. Appx. at 522-23.

Because, under *Hankins* and other decisions of the Eleventh Circuit, dissimilarly situated comparators - here Dobbs, Pinegar, Davidson, and Garner - do not show pretext, Whitsey must rely solely on the evidence showing that in the span of one year, three similarly situated white engineers, Chappell, Flanagan, and Allen, all committed a Red Board violation and were given thirty day suspensions.  (*See* Part II.A.)  However, as discussed below, this evidence, standing alone, is insufficient to create a fact question as to whether NSR's preferred reasons are pretext for unlawful discrimination.

In *Opsatnik v. Norfolk Southern Corp.*, the plaintiff relied on twenty-four purported comparators to establish that Norfolk Southern's reason for terminating him was a pretext for discrimination.  335 Fed. Appx. at 222.  The district court, finding that

the twenty-four purported comparators could not be used for the purpose of demonstrating pretext because they were not similarly situated, granted summary judgment in favor of Norfolk Southern. *Id.* Plaintiff appealed. On appeal, the United States Court of Appeals for the Third Circuit affirmed the district court's grant of summary judgment in favor of Norfolk Southern. *Id.* at 224. Speaking to the issue of pretext, the Third Circuit agreed with the district court that Opsatnik failed to cast doubt on Norfolk Southern's proffered reasons because "Opsatnik failed to present evidence suggesting a link between the purported comparators and the motivations of the decision-makers who terminated Opsatnik." *Id.* at 223. Although the court "agree[d] with Opsatnik that he . . . identified several individuals who committed violations of either such frequency or severity that they *could* have been discharged under NSR's policy," the court could "not say . . . that the District Court erred in determining that these comparators do not create a genuine issue of material fact." *Id.* at 224 (emphasis in original).

Although there "can be no per se rule that comparator evidence from employees with different supervisors is irrelevant," *id.* at 223, Whitsey, like the plaintiff in *Opsatnik*, has failed to provide evidence from which a reasonable trier of fact could find a link between his comparators and the motivation of the decision-maker who terminated him.[8]

---

[8] Whitsey, in his Opposition to NSR's Motion for Summary Judgment, argued that a jury could find that NSR's proffered reasons are pretextual in light of assurances made to Whitsey by

31

Although Whitsey has identified three comparators who arguably are similarly situated and *could* have been discharged under NSR policy, Campbell was not involved in the discipline imposed on Whitsey's comparators.  Since Campbell was not involved with NSR's decision to discipline any of Whitsey's purported comparators, to establish pretext, Whitsey would for instance, at the very least, need to show that Campbell was aware of the Red Board violations committed by the comparators, was aware of the details of previous violations committed by the comparators, and had knowledge that the comparators were suspended, not terminated, in connection with a Red Board violation. Whitsey has not done so.  To the contrary, the evidence shows that Campbell did not consider the punishment Dobbs, Pinegar, Chappell, Davidson, Flanagan, Garner, or Allen received for their Red Board violations when he terminated Whitsey.  (Doc. 19-13 at 40-41.)  Therefore, Whitsey's comparator evidence does not cast doubt on NSR's stated reasons for his termination.

In the previous Memorandum Opinion denying NSR's Motion for Summary Judgment, (doc. 31), the court also found that the fact that some of Whitsey's comparators

---

B.S. Tipton, a NSR Road Foreman.  (Doc. 22 at 10-11; *see also* doc. 23-1 ¶ 6.)  Whitsey maintained that B.S. Tipton told him that he would only receive a thirty day suspension following the 2006 Red Board violation.  (Doc. 22 at 10-11; doc. 23-1 ¶ 6.)  The court did not consider this statement in its pretext analysis in the previous Memorandum Opinion and does not do so here either because B.S. Tipton was not a decision-maker.  (*See* doc. 31 at 24-26.) Therefore, the alleged statement does not show pretext.

had prior suspensions for operational violations in their disciplinary records and only received a suspension for a Red Board violation, whereas Whitsey had only non-operational violations in his disciplinary record and was terminated, "demonstrate[d] the implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons ...." (Doc. 31 at 26.)  Upon reconsideration, the court concludes that the operational versus non-operational distinction is insufficient to raise a fact question as to pretext.  This distinction shows pretext only if Whitsey can show that Campbell was aware, at the time he terminated Whitsey, that Whitsey's comparators had previously committed operational violations yet were suspended, not terminated.  Because Campbell was not involved in the termination of Whitsey's comparators and had no knowledge of the discipline imposed on them at the time he terminated Whitsey, Campbell's judgment regarding Whitsey does not demonstrate any implausibility, inconsistency, incoherency, or contradiction that would permit a reasonable fact finder to determine that NSR's legitimate, non-discriminatory reason to terminate Whitsey was unworthy of credence or more likely motivated by discriminatory animus.  Just as "[d]ifferent supervisors may insist upon different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important," *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002), different supervisors may have different views about the severity and significance of previous violations

contained in the disciplinary records of NSR employees, thus justifying the different

punishments Whitsey and his comparators received for committing the same violation.

NSR's decision to terminate Whitsey depended on whether Campbell (and not anyone

else), in his judgment, honestly regarded Mr. Whitsey's Red Board violation, when

evaluated in light of Whitsey's disciplinary history, as justifying termination.  *See*, *e.g.*,

*Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004)("The relevant issue here is

not whether [the employee] actually falsified the entry, but rather whether [the employer]

honestly *believed* [the employee] falsified the entry.") (citations omitted), *overruled on*

*other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).  Absent evidence that

goes beyond "merely quarreling with the wisdom" of NSR's preferred reasons for

Whitsey's termination, *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)

(citations omitted), it is not within the province of this court to second guess that

judgment.  Consequently, NSR's Motion for Reconsideration is due to be granted.[9]

---

[9] The court finds that Whitsey's claims are not precluded by the RLA.  (*See* doc. 33 at 9-
17.)  The court has subject matter jurisdiction to render this decision because Whitsey's claims
do not require interpretation of the CBA.  *See Pyles v. United Airlines, Inc.*, 79 F.3d 1046, 1050
(11th Cir. 1996)("[O]nly where *interpretation* of a CBA is required will the claim be
preempted.").  Instead, Whitsey's claim involves "purely factual questions" that pertain "to the
conduct of the employee and the conduct and motivation of the employer." *Lingle v. Norge Div.
of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988); *see Hawaiian Airlines v. Norris*, 512 U.S. 246,
252-66 (1994).  Even assuming CBA provisions are relevant to Whitsey's claims, reference to
the CBA would not conclusively dispose of this case.  *See Brown v. Illinois Cent. R. Co.*, 254
F.3d 654, 668 (7th Cir. 2001)("A claim brought under an independent federal statute is precluded
by the RLA only if it can be dispositively resolved through an interpretation of a CBA."); *cf.
Pyles*, 79 F.3d at 1050 ("The fact that *reference* to a CBA may be required, particularly where

## CONCLUSION

For the foregoing reasons, NSR's Motion for Reconsideration, (doc. 33), is due to be granted, and NSR's Motion for Summary Judgment, (doc. 17), is also due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE**, this 31st day of March, 2011.

*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

---

factual issues are involved, is insufficient of itself to preempt an independent . . . claim . . . ."). Therefore, the court rejects NSR's argument that Whitsey's claims are precluded by the RLA.

35